# SECRET

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **PATRICIA ASHTON DERGES** <br> [DOB: 12/27/1957], <br><br> Defendant. | No. 21-3016-01-CR-S-BCW <br><br> **COUNTS 1-8** <br> 18 U.S.C. § 1343 <br> (Wire Fraud) <br> NMT 20 Years Imprisonment <br> NMT $250,000 Fine <br> NMT 3 Years Supervised Release <br> Class C Felony <br><br> **COUNTS 9-18** <br> 21 U.S.C. § 841(h)(1) <br> (Distribution by Means of the Internet without a Valid Prescription) <br> NMT 20 Years Imprisonment <br> NMT $1,000,000 Fine <br> NLT 3 Years Supervised Release <br> Class C Felony <br><br> **COUNTS 19-20** <br> 18 U.S.C. § 1001 <br> (False Statements) <br> NMT 5 Years Imprisonment <br> NMT $250,000 Fine <br> NMT 3 Years Supervised Release <br> Class D Felony <br><br> **FORFEITURE ALLEGATION** <br> 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C § 2461 <br><br> Mandatory Restitution <br> $100 Special Assessment per felony count of conviction |

# INDICTMENT

**THE GRAND JURY CHARGES THAT:**

At all times material to this Indictment, unless otherwise set forth, with all dates and times alleged to be "on or about" or "in or about," and all amounts alleged to be "approximately:"

## Introduction

1. Patricia Ashton DERGES ("DERGES"), the defendant, is an assistant physician licensed to practice by the State of Missouri under number ending in 2792 and was registered to prescribe controlled substances by the United States Drug Enforcement Administration (DEA) under number ending 9851. DERGES is a resident of Christian County within the Western District of Missouri.

2. An assistant physician is a mid-level medical profession in the State of Missouri. Under Missouri law, Section 334.036, RSMo, medical school graduates who have not been accepted into a residency program but have passed Step 1 and Step 2 of the United States Medical Licensing Examination may apply to become an assistant physician. Further, in order to practice as an assistant physician, Section 334.036, RSMo, mandates that assistant physicians practice pursuant to a collaborative practice arrangement with a licensed physician.

3. DERGES obtained her medical degree from the Caribbean Medical University of Curacao in May 2014 but was not accepted into a post-graduate residency program. DERGES was licensed as an assistant physician by the State of Missouri on September 8, 2017, and she obtained her DEA registration on February 1, 2018. DERGES' collaborating physician from September 8, 2017 through January 31, 2019, was A.T. and her collaborating physician from January 31, 2019, to approximately November 11, 2020, was L.V.

## Derges' Businesses

4. DERGES organized Ozark Valley Medical Clinic, llc, (OVMC) as a member managed limited liability company under the laws of the State of Missouri on July 28, 2014.

5. From in or about 2014 to the present, DERGES has operated at three OVMC locations: 3259 East Sunshine, Springfield, Greene County, Missouri; 5571 North 21st Street, Ozark, Christian County, Missouri, and 2715 West 76 Country Boulevard, Branson, Taney County, Missouri.

6. DERGES held OVMC's bank account at Great Southern Bank. Great Southern Bank is a subsidiary of Great Southern Bancorp, Inc., headquartered in Springfield, Missouri with branch offices located throughout southwest Missouri. DERGES opened account ending 4503 at Great Southern Bank on August 13, 2013, and owned the account (through OVMC) and controlled it as the only authorized user.

7. DERGES provided patient care at OVMC and employed other assistant physicians at OVMC to provide patient care. Among DERGES' OVMC employees were assistant physicians R.P., H.D., and J.K.

8. Patient records at OVMC were created, kept, and maintained by two different means: hard copy paper records and an electronic medical records system, Practice Fusion.

9. Practice Fusion's electronic medical records system was an internet-based software that allowed users to create an electronic prescription and transmit the prescription by means of the Internet to pharmacies, among other capabilities.

10. DERGES routinely created electronic prescriptions in Practice Fusion's electronic medical records system and transmitted those electronic prescriptions by means of the Internet to pharmacies.

11. In or about November 2019, DERGES became a distributor for the University of Utah's amniotic fluid products. DERGES marketed the University of Utah's amniotic fluid products under the name Regenerative Biologics™.

## Derges' Regenerative Medicine Practice

12. DERGES' OVMC website stated that they are "The LEADER in PAIN & REGENERATIVE MEDICINE in SOUTHWEST MISSOURI SINCE 2014."

13. Regenerative medicine involves replacing, engineering, or regenerating human cells, tissues, or organs to establish, restore, or enhance normal function.

14. DERGES claimed to treat her patients with regenerative medicine by such practices as prolotherapy, platelet rich plasma, and stem cells. In fact, DERGES advertised OVMC as a "Leader in … Regenerative Medicine" including "Stem Cells."

15. DERGES' "stem cell" practice was to administer amniotic fluid to her patients by various techniques, including, injection, intravenously (IV), and nebulizer.

16. DERGES marketed her "stem cell" practice through seminars she titled "STEM CELL EDUCATIONAL SEMINAR." For instance, in an August 20, 2019, "stem cell educational seminar," DERGES told her audience that the amniotic fluid she used in her stem cell practice was a "stem cell shot" and that it contained "mesenchymal stem cells."

17. DERGES told the same audience that she would use the term "stem" or the phrase "stem cell shot" when referring to "mesenchymal stem cells" or "amniotic fluid."

18. DERGES was the only assistant physician at OVMC who administered amniotic fluid to patients. DERGES administered amniotic fluid that she claimed contained mesenchymal stem cells as treatment for patients who suffered from, among other things, tissue damage, kidney

4

disease, chronic obstructive pulmonary disease ("COPD"), Lyme Disease, erectile dysfunction, and urinary incontinence.

19. The amniotic fluid DERGES administered to her patients did not contain mesenchymal stem cells, or any other stem cells.

20. From on or about November 2018, to on or about April 2020, DERGES exclusively obtained the amniotic fluid she administered to her patients from the University of Utah. The amniotic fluid she obtained from the University of Utah was a sterile filtered amniotic fluid allograft.

21. The University of Utah's amniotic fluid allograft was "acellular," meaning, it did not contain any cells, including stem cells.

22. The University of Utah sold its amniotic fluid allograft to DERGES for approximately, $244.00 for 1.0 ml and $438.00 for 2.0 ml. DERGES charged her patients, $950 to $1,450 per ml of amniotic fluid allograft.

23. In a March 30, 2019, e-mail exchange with J.P., University of Utah's Director of Cell Therapy and Regenerative Medicine, DERGES wrote that "there were no live stem cells in [platelet rich plasma] or amniotic fluid."

24. In September of 2019, prior to DERGES becoming a distributer for the University of Utah's amniotic fluid products, DERGES purchased a booth at a Las Vegas pain management seminar. DERGES sought to use the booth to promote sales of the University of Utah's amniotic fluid allograft through her distributorship, Regenerative Biologics$^{TM}$. On August 25, 2019, DERGES wrote to J.P. concerning another amniotic fluid provider's literature: "I noted that they actually listed the #'s of how many [mesenchymal stem cells] and other products, including naming the main cytokines inside their [amniotic fluid], do we have any of this on ours or how

5

should I answer if someone at the shows ask?" In an August 26, 2019, e-mail, J.P. responded to DERGES, "Our product is acellular so it doesn't have any [mesenchymal stem cells.]"

25. Despite being told by J.P. that the University of Utah's amniotic fluid allograft was "acellular" and did not contain mesenchymal stem cells, DERGES continued to tell her patients and the public that the amniotic fluid allograft contained stem cells. Derges made such representations at the September 2019 Las Vegas paint management seminar.

26. In an April 11, 2020, Facebook post DERGES wrote of amniotic fluid allograft: "This amazing treatment stands to provide a potential cure for COVID-19 patients that is safe and natural[.]" DERGES further wrote, "All of the components of the God given Amniotic Fluid: Mesenchymal Stem Cells (progenitor cells which are baby stem cells: can become any tissue they want); cytokines, exosomes, chemokines, hyaluronic acid, growth factors and over 800 proteins work together to create a human being: the emphasis on the lungs."

## The Controlled Substances Act

27. The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 801, *et seq.*, and its implementing regulations governed the manufacture, distribution, and dispensation of controlled substances in the United States. The CSA established a closed regulatory system under which it was unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.

28. The CSA categorized controlled substances into five schedules, including Schedule II controlled substances. Pursuant to Title 21, United States Code, Section 812(b)(2), Schedule II contained drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence" but nonetheless had "a currently accepted medical use in treatment."

29. Pursuant to Title 21, Code of Federal Regulations, Section 1308.12(b)(1)(xiv), oxycodone is a Schedule II controlled substance.

30. Pursuant to Title 21, Code of Federal Regulations, Section 1308.12(d)(2), amphetamine, its salts, optical isomers, and salts of its optical isomers, is a Schedule II controlled substance.

31. The CSA, under Title 21, United States Code, Section 822(a), required those who distribute or dispense controlled substances to obtain a registration from the DEA. Pursuant to Title 21, United States Code, Section 822(b), an assistant physician who receives a DEA registration may only dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with" the CSA.

32. Pursuant to Title 21, United States Code, Section 822(a) and Title 21, Code of Federal Regulations, Section 1306.03(a), a prescription for a controlled substance could only be distributed or dispensed by a practitioner who is: (a) authorized to prescribe controlled substances by the jurisdiction in which the practitioner is licensed; and (b) registered with the DEA.

33. Pursuant to Title 21, United States Code, Section 841(h) it was unlawful to write "a prescription for a controlled substance for the purpose of delivery, distribution, or dispensation by means of the Internet in violation of" Title 21, United States Code, Section 829(e).

34. In turn, Title 21, United States Code, Section 829(e)(1) provided that, "No controlled substance that is a prescription drug as determined under the Federal, Food, Drug, and Cosmetic Act may be delivered, distributed, or dispensed by means of the Internet without a valid prescription."

35. Further, pursuant to Title 21, United States Code, Section 829(e)(2)(A) in order for a prescription to be valid it had to be "be issued for a legitimate medical purpose in the usual course

of practice by (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient or (ii) a covering practitioner."

36. Under Title 21, United States Code, Section 802(50), "'Internet' means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected worldwide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocol to such protocol, to communicate information of all kinds of wire or radio."

37. Under Title 21, United States Code, Section 802(51), "deliver, distribute, or dispense by means of the Internet refers, respectively, to any delivery, distribution, or dispensing of a controlled substances that is caused or facilitated by means of the Internet."

38. Title 21, United States Code, Section 829(e)(2)(B)(i) provided that an "in-person medical evaluation" is "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals."

39. Further, Title 21, United States Code, Section 829(e)(2)(C) provided that a "covering practitioner" is "with respect to a patient, a practitioner who conducts a medical evaluation (other than an in-person medical evaluation) at the request of a practitioner who—(i) has conducted at least 1 in-person medical evaluation of the patient or an evaluation of the patient through the practice of telemedicine, within the previous 24 months; and (ii) is temporarily unavailable to conduct the evaluation of the patient."

**Derges' Prescription Practices**

40. Until August 11, 2020, DERGES was the only assistant physician at OVMC who had a DEA registration.

41. Because none of the other OVMC assistant physicians could prescribe Schedule II controlled substances, it was the standard practice of the assistant physicians who DERGES employed at OMVC to see a patient and later communicate to DERGES the controlled substances they wanted DERGES to prescribe to their patients.

42. DERGES, without conducting an in-person medical evaluation of the other assistant physicians' patients, and despite not being the covering practitioner with respect to such patients, wrote electronic prescriptions for the patients in Practice Fusion's electronic medical records system and subsequently transmitted the prescriptions by means of the Internet to pharmacies. DERGES wrote these electronic prescriptions for patients examined by Assistant Physicians R.P., H.D., and J.K.

43. Assistant Physician R.P. was employed by DERGES at OVMC from approximately October 2019 through June 2020. During that time period, R.P. did not have a DEA registration and therefore could not prescribe Schedule II controlled substances.

44. Assistant Physician H.D. was employed by DERGES at OVMC from approximately October 2019 through February 2020. H.D. was not registered to prescribe controlled substances by the DEA and therefore could not prescribe Schedule II controlled substances.

45. Assistant Physician J.K. was employed by DERGES at OVMC from approximately April 2019 to the present. Prior to August 11, 2020, J.K. was not registered to prescribe controlled substances by the DEA and therefore could not prescribe Schedule II controlled substances.

## COUNTS 1 – 8
18 U.S.C. § 1343
(Wire Fraud)

46. The factual allegations of Paragraphs 1 through 26 of this Indictment are re-alleged and incorporated as though fully set forth.

### The Scheme to Defraud

47. Beginning on an unknown date, but no later than in or about December 2018, and continuing until in or about May 2020, in Greene County, in the Western District of Missouri, and elsewhere, DERGES, with the intent to defraud, devised and intended to devise a scheme to defraud her patients, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

48. It was a part of the scheme that DERGES presented promotional seminars at which she told prospective patients that she could treat various medical conditions with stem cells by way of false and misleading statements and representations, including that the amniotic fluid allograft that she used in her practice contained stem cells.

49. It was a part of the scheme that DERGES told patients that she was treating them with stem cells by way of false and misleading statements and representations, including that the amniotic fluid allograft that she administered to the patient as part of the patient's treatment contained stem cells.

50. In furtherance of the scheme DERGES injected A.L. with 2 ml of amniotic fluid allograft on September 11, 2019, and October 23, 2019. A.L. suffered from hip pain. A.L. met DERGES at a Las Vegas pain management seminar where A.L. discussed her condition with DERGES. After discussing treatment options with DERGES, A.L. decided to try DERGES' "stem cell" injections.

51. In furtherance of the scheme DERGES injected D.B. with 2 ml of amniotic fluid allograft on December 19, 2019, and February 12, 2020. D.B. suffered from hip pain and found DERGES through OVMC's website. D.B. was seeking stem cell treatment for hip pain. DERGES told D.B. that DERGES obtained the "stem cells" she used in D.B.'s treatment from the University of Utah.

52. In furtherance of the scheme DERGES injected J.K. with 2 ml of amniotic fluid allograft on October 9, 2019 and December 10, 2019. J.K. suffered from hip and back pain. J.K. did on-line research into stem cell treatment for J.K.'s pain and found DERGES through OVMC's website. DERGES told J.K. that the amniotic fluid allograft contained "stem cells." DERGES injected J.K. with 2 ml of amniotic fluid allograft on October 9, 2019 and December 10, 2019.

53. In furtherance of the scheme DERGES administered to A.M. a total of 6 ml of amniotic fluid by IV and nebulizer on November 12 and 20, 2019, and 3 ml of amniotic fluid by IV and nebulizer on June 17, 2020. A.M. suffered from COPD. A.M. heard DERGES discussing stem cell treatments on a radio show, which led A.M. to set up an appointment with DERGES. DERGES told A.M. that the stem cells she would be administering to him were newer than his own stem cells because they came from amniotic fluid that was extracted by the University of Utah.

54. In furtherance of the scheme DERGES injected T.M. with 1 ml of amniotic fluid allograft on February 19, 2019. T.M. suffered from erectile dysfunction. T.M. found OVMC and DERGES through internet research into platelet rich plasma treatment. DERGES recommended stem cells to T.M. as an alternative treatment to platelet rich plasma treatment he came to her seeking. T.M. followed DERGES' recommendation.

55. It was further a part of the scheme that DERGES induced her patients, including A.L., D.B., J.K., A.M., and T.M. to pay between $950.00 and $6,500 for amniotic fluid allograft that the patients believed contained stem cells. In total, DERGES' patients paid DERGES approximately $191,815.00 for amniotic fluid that did not contain stem cells.

## The Charges

56. On or about each of the dates set forth below, in Greene County, in the Western District of Missouri, and elsewhere, the defendant, **PATRICIA ASHTON DERGES**, for the purpose of executing the scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises described above, did knowingly transmit and caused to be transmitted, and attempted to transmit and cause to be transmitted, in interstate commerce, by means of wire communication, writing, signs, signals, pictures, and sounds, that is the electronic wire transmission of funds, as described below for each count, each transmission constituting a separate count:

| **COUNT** | **Date** | **Description** |
|---|---|---|
| 1 | September 12, 2019 | $4,650.00 deposited into Derges' Great Southern Bank account ending 4503 from Central Bank of the Ozarks, debited against A.L.'s account ending 5905. |
| 2 | October 24, 2019 | $3,681.56 deposited into Derges' Great Southern Bank account ending 4503 from Central Bank of the Ozarks, $2,700.00 of which was debited against A.L.'s account ending 5905. |
| 3 | December 23, 2019 | $3,224.00 deposited into Derges' Great Southern Bank account ending 4503 from Capital One Visa, $2,900.00 of which debited against D.B.'s account ending 0095. |
| 4 | February 14, 2020 | $7,195.00 deposited into Derges' Great Southern Bank account ending 4503 from Capital One Visa, $1,950.00 of which was debited against D.B.'s account ending 0095. |
| 5 | October 11, 2019 | $6,175.00 deposited into Derges' Great Southern Bank account ending 4503 from CareCredit, $2,900 of which was debited against J.K.'s account ending 3504. |
| 6 | December 13, 2019 | $3,245.00 deposited into Derges' Great Southern Bank account ending 4503 from CareCredit, $1,750.00 of which was debited against J.K.'s account ending 3504. |

| 7 | November 12, 2019 | $6,500.00 deposited into Derges' Great Southern Bank account ending 4503 from Arvest Bank, debited against A.M.'s account ending 6748. |
|---|---|---|
| 8 | February 21, 2019 | $3,980.00 deposited into Derges' Great Southern Bank account ending 4503 from American Express, of which $1,905.00 was debited against T.M.'s account ending 1009. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 9-18
21 U.S.C. § 841(h)(1)
(Distribution by Means of the Internet without a Valid Prescription)

57. The factual allegations of Paragraphs 1 through 5, 7 through 10, and 27 through 45, of this Indictment are re-alleged and incorporated as though fully set forth.

58. On or about each of the dates set forth below, in Greene County, in the Western District of Missouri, and elsewhere, the defendant, **PATRICIA ASHTON DERGES**, did knowingly, intentionally, and unlawfully distribute the listed Schedule II controlled substances, through invalid prescriptions by means of the internet, in violation of Title 21, United States Code, Section 841(h)(1).

| Count | Patient | Treating Assistant Physician | Prescription Date & Pharmacy Received Date | Prescription Number | Controlled Substance |
|---|---|---|---|---|---|
| 9 | P.V. | H.D. | 10/25/2019 | 2263554 | Oxycodone HCL 10 mg x 9 |
| 10 | K.K. | R.P. | 11/18/2019 | 2077228 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 60 |
| 11 | K.K. | R.P. | 12/12/2019 | 2077579 | Amphetamine-dextroamphetamine (Adderall) 10 mg x 30 |
| 12 | K.K. | R.P. | 01/22/2020 | 2078132 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 13 | K.K. | R.P. | 02/20/2020 | 2078520 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |

| 14 | K.K. | R.P. | 03/18/2020 | 2078929 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 15 | K.K. | J.K. | 04/23/2020 | 2079321 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 60 |
| 16 | B.H. | H.D. | 02/27/2020 | 2222255 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 17 | B.H. | H.D. | 04/02/2020 | 2222565 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 18 | B.H. | J.K. | 05/04/2020 | 2222816 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |

**COUNT 19**
18 U.S.C. § 1001(a)(2)
(False Statement or Representation Made to a Department or Agency of the United States)

59. On or about May 5, 2020, in Greene County, in the Western District of Missouri, the defendant, **PATRICIA ASHTON DERGES** did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating to Federal Bureau of Investigation, Special Agent M.E. and United States Department of Health and Human Services, Office of Inspector General, Special Agent T.D., that the amniotic fluid allograft that she used in her practice contained mesenchymal stem cells. The statement and representation was false because, as **PATRICIA ASHTON DERGES** then and there knew, the amniotic fluid allograft that she used in her practice did not contain mesenchymal stem cells.

In violation of Title 18, United States Code Section 1001.

## COUNT 20
18 U.S.C. § 1001(a)(2)
(False Statement or Representation Made to a Department or Agency of the United States)

60. On or about May 5, 2020, in Greene County, in the Western District of Missouri, the defendant, **PATRICIA ASHTON DERGES** did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating to Federal Bureau of Investigation, Special Agent M.E. and United States Department of Health and Human Services, Office of Inspector General, Special Agent T.D., that she had not treated a patient for urinary incontinence with amniotic fluid allograft. The statement and representation was false because, as **PATRICIA ASHTON DERGES** then and there knew, she had treated a patient for urinary incontinence with amniotic fluid allograft.

In violation of Title 18, United States Code Section 1001.

## FORFEITURE ALLEGATION

61. The factual allegations of Paragraphs 1 through 26 and Paragraphs 46 through 56 of the Indictment are re-alleged and incorporated as though fully set forth herein for the purpose of alleging forfeiture to the United States pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 1343, and Title 28, United States Code, Section 2461.

62. As a result of the offenses alleged in Counts 1 through 8 of this Indictment, and pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461, the defendant, **PATRICIA ASHTON DERGES**, shall forfeit to the United States all property, real and personal, constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of the violations incorporated by reference in this Allegation.

## Money Judgment

63. A money judgment representing proceeds obtained by the defendant in that the sum in aggregate, constitutes or is derived from proceeds traceable to the offenses set forth in Counts 1 through 8.

## Substitute Assets

64. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred, sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of forfeitable property.

**A TRUE BILL**

*/s/ Kevin Elliott*
**FOREPERSON OF THE GRAND JURY**

*/s/ Shannon Kempf*
**SHANNON T. KEMPF**
Assistant United States Attorney

DATED: 1/20/2021