

**SECRET**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | No. 21-3016-01-CR-S-BCW |
| Plaintiff, | **COUNTS 1-8 and 21-23**<br>18 U.S.C. § 1343<br>(Wire Fraud)<br>NMT 20 Years Imprisonment<br>NMT $250,000 Fine<br>NMT 3 Years Supervised Release<br>Class C Felony |
| v. | |
| **PATRICIA ASHTON DERGES**<br>[DOB: 12/27/1957], | **COUNTS 9-18**<br>21 U.S.C. § 841(h)(1)<br>(Distribution by Means of the Internet<br>without a Valid Prescription)<br>NMT 20 Years Imprisonment<br>NMT $1,000,000 Fine<br>NLT 3 Years Supervised Release<br>Class C Felony |
| Defendant. | |

**COUNTS 19-20**
18 U.S.C. § 1001
(False Statements)
NMT 5 Years Imprisonment
NMT $250,000 Fine
NMT 3 Years Supervised Release
Class D Felony

**FORFEITURE ALLEGATION**
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C
§ 2461

Mandatory Restitution
$100 Special Assessment per felony count
of conviction

## SUPERSEDING I N D I C T M E N T

**THE GRAND JURY CHARGES THAT:**

At all times material to this Indictment, unless otherwise set forth, with all dates and times

alleged to be "on or about" or "in or about," and all amounts alleged to be "approximately:"

## Introduction

1.      Patricia Ashton DERGES ("DERGES"), the defendant, is an assistant physician licensed to practice by the State of Missouri under number ending in 2792 and was registered to prescribe controlled substances by the United States Drug Enforcement Administration (DEA) under number ending 9851. DERGES is a resident of Christian County within the Western District of Missouri.

2.      An assistant physician is a mid-level medical profession in the State of Missouri. Under Missouri law, Section 334.036, RSMo, medical school graduates who have not been accepted into a residency program but have passed Step 1 and Step 2 of the United States Medical Licensing Examination may apply to become an assistant physician. Further, in order to practice as an assistant physician, Section 334.036, RSMo, mandates that assistant physicians practice pursuant to a collaborative practice arrangement with a licensed physician.

3.       DERGES obtained her medical degree from the Caribbean Medical University of Curacao in May 2014 but was not accepted into a post-graduate residency program. DERGES was licensed as an assistant physician by the State of Missouri on September 8, 2017, and she obtained her DEA registration on February 1, 2018. DERGES' collaborating physician from September 8, 2017 through January 31, 2019, was A.T. and her collaborating physician from January 31, 2019, to approximately November 11, 2020, was L.V.

## Derges' Businesses

4.      DERGES organized Ozark Valley Medical Clinic, LLC, (OVMC) as a member managed limited liability company under the laws of the State of Missouri on July 28, 2014.

5.      From in or about 2014 to the present, DERGES has operated at three OVMC locations: 3259 East Sunshine, Springfield, Greene County, Missouri; 5571 North 21st Street,

2

Ozark, Christian County, Missouri, and 2715 West 76 Country Boulevard, Branson, Taney County, Missouri. OVMC's Federal Employer Identification Number (FEIN) ends in 4401.

6.     DERGES incorporated Lift Up Someone Today, Inc., (Lift Up) as a Non-Profit Corporation under the laws of the state of Missouri on February 3, 2016. Lift Up was granted an exemption from federal income taxes under Internal Revenue Code Section 501(c)(3) on April 7, 2016, as a public charity. From in or about 2018, DERGES has operated Lift Up's medical and dental clinics at 2005 East Kearney, Suite K, Springfield, Greene County, Missouri. Lift Up's FEIN ends in 3560.

7.     DERGES controlled the operations and finances of OVMC and Lift Up.

8.     Publicly, DERGES blurred the distinction between her for profit OVMC medical clinics, and her Non-Profit, Lift Up. OVMC's website stated "We are 'Lift Up Ozark', a part of 'Lift Up Someone Today', a 501c3 [sic] Non-Profit mission clinic...Our 'Lift Up Springfield' mission provides medical, dental and mental health care to the homeless, poverty stricken and Veterans of SW Missouri…Our 'Lift Up Ozark' mission (Ozark Valley Medical Clinic) was found [sic] to help the working person." In turn, Lift Up's website stated, "Lift Up has opened up 3 more locations (E. Springfield, Ozark and Branson) for the 'Working Person'. [sic]"

9.     Despite DERGES' claims on OVMC's website and Lift Up's website, Lift Up and OVMC are separate legal entities.

10.     DERGES held OVMC's bank account at Great Southern Bank. Great Southern Bank is a subsidiary of Great Southern Bancorp, Inc., ("Great Southern Bank") headquartered in Springfield, Missouri with branch offices located throughout southwest Missouri. DERGES opened account ending 4503 at Great Southern Bank on August 13, 2013, and owned the account (through OVMC) and controlled it as the only authorized user.

3

11.    DERGES held Lift Up's bank account at Great Southern Bank. DERGES opened account ending 5151 at Great Southern Bank on July 17, 2015. DEGRES controlled this account as the only authorized user.

12.    DERGES provided patient care at OVMC and employed other assistant physicians at OVMC to provide patient care. Among DERGES' OVMC employees were assistant physicians R.P., H.D., and J.K.

13.    Patient records at OVMC were created, kept, and maintained by two different means:  hard copy paper records and an electronic medical records system, Practice Fusion.

14.    Practice Fusion's electronic medical records system was an internet-based software that allowed users to create an electronic prescription and transmit the prescription by means of the Internet to pharmacies, among other capabilities.

15.    DERGES routinely created electronic prescriptions in Practice Fusion's electronic medical records system and transmitted those electronic prescriptions by means of the Internet to pharmacies.

16.    In or about November 2019, DERGES became a distributer for the University of Utah's amniotic fluid products. DERGES marketed the University of Utah's amniotic fluid products under the name Regenerative Biologics$^{TM}$.

**<u>Derges' Regenerative Medicine Practice</u>**

17.    DERGES' OVMC website stated that they are "The LEADER in PAIN & REGENERATIVE MEDICINE in SOUTHWEST MISSOURI SINCE 2014."

18.    Regenerative medicine involves replacing, engineering, or regenerating human cells, tissues, or organs to establish, restore, or enhance normal function.

19. DERGES claimed to treat her patients with regenerative medicine by such practices as prolotherapy, platelet rich plasma, and stem cells. In fact, DERGES advertised OVMC as a "Leader in … Regenerative Medicine" including "Stem Cells."

20. DERGES' "stem cell" practice was to administer amniotic fluid to her patients by various techniques, including, injection, intravenously (IV), and nebulizer.

21. DERGES marketed her "stem cell" practice through seminars she titled "STEM CELL EDUCATIONAL SEMINAR." For instance, in an August 20, 2019, "stem cell educational seminar," DERGES told her audience that the amniotic fluid she used in her stem cell practice was a "stem cell shot" and that it contained "mesenchymal stem cells."

22. DERGES told the same audience that she would use the term "stem" or the phrase "stem cell shot" when referring to "mesenchymal stem cells" or "amniotic fluid."

23. DERGES was the only assistant physician at OVMC who administered amniotic fluid to patients. DERGES administered amniotic fluid that she claimed contained mesenchymal stem cells as treatment for patients who suffered from, among other things, tissue damage, kidney disease, chronic obstructive pulmonary disease ("COPD"), Lyme Disease, erectile dysfunction, and urinary incontinence.

24. The amniotic fluid DERGES administered to her patients did not contain mesenchymal stem cells, or any other stem cells.

25. From on or about November 2018, to on or about April 2020, DERGES exclusively obtained the amniotic fluid she administered to her patients from the University of Utah. The amniotic fluid she obtained from the University of Utah was a sterile filtered amniotic fluid allograft.

26.     The University of Utah's amniotic fluid allograft was "acellular," meaning, it did not contain any cells, including stem cells.

27.     The University of Utah sold its amniotic fluid allograft to DERGES for approximately, $244.00 for 1.0 ml and $438.00 for 2.0 ml. DERGES charged her patients, $950 to $1,450 per ml of amniotic fluid allograft.

28.     In a March 30, 2019, e-mail exchange with J.P., University of Utah's Director of Cell Therapy and Regenerative Medicine, DERGES wrote that "there were no live stem cells in [platelet rich plasma] or amniotic fluid."

29.     In September of 2019, prior to DERGES becoming a distributer for the University of Utah's amniotic fluid products, DERGES purchased a booth at a Las Vegas pain management seminar. DERGES sought to use the booth to promote sales of the University of Utah's amniotic fluid allograft through her distributorship, Regenerative Biologics™. On August 25, 2019, DERGES wrote to J.P. concerning another amniotic fluid provider's literature: "I noted that they actually listed the #'s of how many [mesenchymal stem cells] and other products, including naming the main cytokines inside their [amniotic fluid], do we have any of this on ours or how should I answer if someone at the shows ask?" In an August 26, 2019, e-mail, J.P. responded to DERGES, "Our product is acellular so it doesn't have any [mesenchymal stem cells.]"

30.     Despite being told by J.P. that the University of Utah's amniotic fluid allograft was "acellular" and did not contain mesenchymal stem cells, DERGES continued to tell her patients and the public that the amniotic fluid allograft contained stem cells. DERGES made such representations at the September 2019 Las Vegas paint management seminar.

31.     In an April 11, 2020, Facebook post DERGES wrote of amniotic fluid allograft: "This amazing treatment stands to provide a potential cure for COVID-19 patients that is safe and

natural[.]" DERGES further wrote, "All of the components of the God given Amniotic Fluid: Mesenchymal Stem Cells (progenitor cells which are baby stem cells: can become any tissue they want); cytokines, exosomes, chemokines, hyaluronic acid, growth factors and over 800 proteins work together to create a human being: the emphasis on the lungs."

### The Controlled Substances Act

32.     The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 801, *et seq*., and its implementing regulations governed the manufacture, distribution, and dispensation of controlled substances in the United States. The CSA established a closed regulatory system under which it was unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.

33.     The CSA categorized controlled substances into five schedules, including Schedule II controlled substances. Pursuant to Title 21, United States Code, Section 812(b)(2), Schedule II contained drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence" but nonetheless had "a currently accepted medical use in treatment."

34.      Pursuant to Title 21, Code of Federal Regulations, Section 1308.12(b)(1)(xiv), oxycodone is a Schedule II controlled substance.

35.     Pursuant to Title 21, Code of Federal Regulations, Section 1308.12(d)(2), amphetamine, its salts, optical isomers, and salts of its optical isomers, is a Schedule II controlled substance.

36.     The CSA, under Title 21, United States Code, Section 822(a), required those who distribute or dispense controlled substances to obtain a registration from the DEA. Pursuant to Title 21, United States Code, Section 822(b), an assistant physician who receives a DEA

registration may only dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with" the CSA.

37. Pursuant to Title 21, United States Code, Section 822(a) and Title 21, Code of Federal Regulations, Section 1306.03(a), a prescription for a controlled substance could only be distributed or dispensed by a practitioner who is: (a) authorized to prescribe controlled substances by the jurisdiction in which the practitioner is licensed; and (b) registered with the DEA.

38. Pursuant to Title 21, United States Code, Section 841(h) it was unlawful to write "a prescription for a controlled substance for the purpose of delivery, distribution, or dispensation by means of the Internet in violation of" Title 21, United States Code, Section 829(e).

39. In turn, Title 21, United States Code, Section 829(e)(1) provided that, "No controlled substance that is a prescription drug as determined under the Federal, Food, Drug, and Cosmetic Act may be delivered, distributed, or dispensed by means of the Internet without a valid prescription."

40. Further, pursuant to Title 21, United States Code, Section 829(e)(2)(A) in order for a prescription to be valid it had to be "be issued for a legitimate medical purpose in the usual course of practice by (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient or (ii) a covering practitioner."

41. Under Title 21, United States Code, Section 802(50), "'Internet' means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected worldwide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocol to such protocol, to communicate information of all kinds of wire or radio."

42. Under Title 21, United States Code, Section 802(51), "deliver, distribute, or dispense by means of the Internet refers, respectively, to any delivery, distribution, or dispensing of a controlled substances that is caused or facilitated by means of the Internet."

43. Title 21, United States Code, Section 829(e)(2)(B)(i) provided that an "in-person medical evaluation" is "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals."

44. Further, Title 21, United States Code, Section 829(e)(2)(C) provided that a "covering practitioner" is "with respect to a patient, a practitioner who conducts a medical evaluation (other than an in-person medical evaluation) at the request of a practitioner who—(i) has conducted at least 1 in-person medical evaluation of the patient or an evaluation of the patient through the practice of telemedicine, within the previous 24 months; and (ii) is temporarily unavailable to conduct the evaluation of the patient."

**Derges' Prescription Practices**

45. Until August 11, 2020, DERGES was the only assistant physician at OVMC who had a DEA registration.

46. Because none of the other OVMC assistant physicians could prescribe Schedule II controlled substances, it was the standard practice of the assistant physicians who DERGES employed at OMVC to see a patient and later communicate to DERGES the controlled substances they wanted DERGES to prescribe to their patients.

47. DERGES, without conducting an in-person medical evaluation of the other assistant physicians' patients, and despite not being the covering practitioner with respect to such patients, wrote electronic prescriptions for the patients in Practice Fusion's electronic medical

records system and subsequently transmitted the prescriptions by means of the Internet to pharmacies. DERGES wrote these electronic prescriptions for patients examined by Assistant Physicians R.P., H.D., and J.K.

48.     Assistant Physician R.P. was employed by DERGES at OVMC from approximately October 2019 through June 2020. During that time period, R.P. did not have a DEA registration and therefore could not prescribe Schedule II controlled substances.

49.     Assistant Physician H.D. was employed by DERGES at OVMC from approximately October 2019 through February 2020. H.D. was not registered to prescribe controlled substances by the DEA and therefore could not prescribe Schedule II controlled substances.

50.     Assistant Physician J.K. was employed by DERGES at OVMC from approximately April 2019 to the present. Prior to August 11, 2020, J.K. was not registered to prescribe controlled substances by the DEA and therefore could not prescribe Schedule II controlled substances.

**The CARES Act**

51.     On March 13, 2020, President Donald J. Trump declared a national emergency in response to the global pandemic caused by SARS-CoV-2 (COVID-19). In addition to causing a public health crisis, COVID-19 had devasting economic effects.

52.     In response to the public health crisis and economic impacts of COVID-19, on March 25, 2020, the United States Congress passed the "Coronavirus Aid, Relief, and Economic Security Act" commonly known as the "CARES Act." (P.L. 116-136) The President signed the CARES Act on March 27, 2020. The CARES Act provided, from the United States Treasury, $150 billion to States, Tribal governments, and units of local government for fiscal year 2020.

53.     Under the CARES Act, the funds provided to a State, Tribal government, and unit of local government, were for costs that ''(1) are necessary expenditures incurred due to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19); (2) were not accounted for in the budget most recently approved as of the date of enactment of this section for the State or government; and (3) were incurred during the period that begins on March 1, 2020, and ends on December 30, 2020."

54.     Under the CARES Act, States were allocated funding based upon a state's population relative to the total population of all States. Missouri was allocated approximately, $2.3 billion. Missouri allocated CARES Act funds to local governments, including Greene County, Missouri. Missouri allocated Greene County, Missouri ("Greene County") approximately $34 million in CARES Act funds and wired approximately $34 million in CARES Act funds to Greene County on May 4, 2020.

55.     Greene County deposited the CARES Act funds in, and paid CARES Act fund awards from, its UMB Bank account, ending 1931. UMB Bank is a subsidiary of UMB Financial Corporation, with locations in Missouri, Illinois, Colorado, Kansas, Oklahoma, Nebraska, Arizona, and Texas.

**Greene County CARES Act Relief Fund**

56.     To administer the CARES Act funds it received, the Greene County Commission created the CARES ACT Relief Fund to "promote recovery by funding programs and services that support the needs of those impacted by the COVID-19 public health emergency." The Greene County Commission created an organizational structure for the CARES Act Relief Fund that prioritized payments that centered on "medical, public health, payroll, compliance with COVID-19 expenses, provisional support expenses, and other COVID-19 related expenses."

57.     The Greene County Commission created an Advisory Council of thirty (30) citizen volunteers to make funding recommendations to the Greene County Commission regarding the CARES Act Relief Fund. The citizen volunteers who comprised the Advisory Council staffed five (5) subcommittees within the Advisory Council. The five (5) subcommittee categories were: Small Business, Non-Profit and Community Organizations, Education, Tax Supported Entities, and Healthcare. The subcommittees reviewed funding request applications from entities whose characteristics fell within a subcommittee's assigned category. The Greene County Commission established funding levels for each of the five categories represented by the subcommittees: Small Business, $6.5 million; Non-Profit and Community Organizations, $5 million; Education, $4.6 million; Tax Supported Entities, $6.5 million; and Health Care, $8 million. The Greene County Commission held approximately $ 4.6 million in reserve. Upon reviewing a funding request application, the subcommittees made funding recommendations to the Advisory Council writ large. In turn, the Advisory Council made funding recommendations to the Greene County Commission. Ultimately, the decision to fund applicants to the CARES Act Relief Fund was made by the Greene County Commission.

58.     Organizations seeking funding from the CARES Act Relief Fund had to submit an application to the Greene County CARES Act Relief Fund through an internet portal set up by Greene County.

59.     Applicants were required, among other things, to identify the legal name of the organization applying to the CARES Act Relief Fund, the organization type, the organization's physical address, contact name for the organization, and the organization's FEIN. As a condition of receiving funds from the CARES Act Relief Fund, all awarded funds had to be used exclusively for expenditures as defined by the CARES Act and related to COVID-19. Applicants were

permitted to request reimbursement for COVID-19 eligible expenses already spent and to request funding for future COVID-19 eligible expenses.

60.     For reimbursement requests, applicants had to identify the project(s) the funds were spent on and the amount(s) spent. Applicants requesting funding for future COVID-19 eligible activities had to also describe the project(s) the funds would be spent on and provide an estimate of the amount of funds that would be spent.

61.     Applicants who received funding awards, whether for reimbursement or future costs, had to provide documentation to support their expenditures.

**OVMC provides COVID-19 Testing Services**

62.     Beginning in or about March 2020, and continuing at least until January 28, 2021, OVMC offered COVID-19 testing services to their clients, patients, or their patients' employers. OMVC collected test samples from patients at its three locations in, Greene County, Missouri, Christian County, Missouri, and Taney County, Missouri. OVMC charged clients, patients, or their patient's employer, approximately $167.00 per sample for its COVID-19 testing services. Many of the COVID-19 tests that OVMC provided were provided outside of Greene County, Missouri.

63.     Beginning on or about April 6, 2020, OVMC contracted with Dynamic DNA Laboratories, Inc., ("Dynamic DNA") to conduct COVID-19 laboratory tests of the samples OMVC collected from its patients. Pursuant to OVMC's contract with Dynamic DNA, Dynamic DNA charged OVMC $99.99 per sample test. On or about June 6, 2020, OVMC and Dynamic DNA amended their contract. Pursuant to an amendment, effective July 1, 2020, Dynamic DNA charged OVMC $94.99 per sample test.

64.     OVMC's COVID-19 testing services were a financial boon for OVMC. Between January 2015 and May 19, 2020, OVMC's daily account balance in its Great Southern Bank

account, ending 4503, never exceeded $50,000.00. By May 20, 2020, OVMC's balance exceeded $50,000.00. By September 22, 2020, the account balance was over $345,000.00. During the period May 20, 2020, through January 28, 2021, the balance never fell below $150,000.00.

65.     Lift Up did not provide COVID-19 testing services to its patients. In fact, Lift Up's medical clinic closed at the beginning of the COVID-19 pandemic. From in or about March 2020 until in or about June 2020, Lift Up's medical clinic was closed.

### Derges Applied for CARES Act Funds on behalf of Lift Up Someone Today

66.     DERGES applied to the Greene County CARES Act Fund on behalf of her Non-Profit, Lift Up, for CARES Act funds. On September 19, 2020, DERGES completed Lift Up's application and submitted it through the internet to Greene County, along with supporting documentation.

67.     In the application, DERGES represented that the organization applying for the funds was Lift Up. DERGES identified Lift Up by its FEIN, address, and organization type. Further, DERGES described Lift Up as "Provides medical, dental and mental health services to the homeless, impoverished and uninsured."

68.     In the application, DERGES represented that the funds would only be used for costs that were incurred by Lift Up, between March 1, 2020 and December 30, 2020. DERGES also represented that the funds would be used exclusively within Greene County.

69.     DERGES requested reimbursement for $379,294.40 and future funding in the amount of $503,350.00. In total, DERGES applied for $882,644.40 in funds from the CARES Act Relief Fund on Lift Up's behalf.  Further, DERGES represented that Lift Up had not "solicited funds via grant application or other means to be reimbursed for items in this request."

70.     The biggest expenditures DERGES claimed for Lift Up were for COVID-19 testing. DERGES represented that Lift Up had spent $304,189.00 for "COVID Testing" between March 2020 and September 2020 and DERGES requested reimbursement from the Greene County CARES Act Relief Fund for those expenditures. DERGES also estimated that Lift Up would spend an additional $475,000.00 on "COVID TEST" [sic] and DERGES requested funding from the Greene County CARES Act Relief Fund for this future expenditure as well.

71.     DERGES supported her claim that Lift Up had spent $304,189.00 for "COVID testing" between March 2020 and September 2020 by submitting, along with Lift Up's application, five (5) e-mails from Dynamic DNA to DERGES. The e-mails contained images of Dynamic DNA invoices for COVID-19 laboratory testing Dynamic DNA had done for OVMC. DERGES submitted the Dynamic DNA invoices as Lift Up expenditures. The five (5) invoices were for the months of April, May, June, July, and August 2020, and totaled $296,574.04. The invoices were for 3,097 COVID-19 test samples collected by OVMC, and tested by Dynamic DNA for COVID-19, pursuant to OVMC's contract with Dynamic DNA. OVMC incurred the cost of the COVID-19 tests and OVMC paid Dynamic DNA the total invoiced amount of $296,574.04. At the time DERGES submitted Lift Up's application seeking reimbursement for these COVID-19 tests from the CARES Act Relief Fund, OVMC clients, patients, or their patients' employers, had already paid OVMC approximately $517,000.00 for these COVID-19 tests. DERGES concealed from Greene County that these COVID-19 tests had already been paid for by other payors.

72.     On September 30, 2020, based upon the representations DERGES made in Lift Up's application, and supporting documentation, the Greene County COVID Relief Fund's Non-Profit Subcommittee recommended, to the Greene County Commission, that Lift Up be awarded CARES Act funds.

73. On December 3, 2020, L.F., on behalf of Greene County, sent DERGES an e-mail in which L.F. requested further documentation for Lift Up's COVID-19 expenditures.

74. On December 4, 2020, DERGES responded by e-mail and provided Greene County (8) eight invoices, as attachments, to further support Lift Up's COVID-19 testing expenditures. In the e-mail, DERGES identified the eight (8) attached invoices as "the COVID testing invoices." The (8) eight invoices were from Dynamic DNA and included three (3) Dynamic DNA invoices for September, October, and November 2020, in addition to the previously submitted invoices for April, May, June, July, and August 2020. The invoices were for 6,177 COVID-19 test samples collected by OVMC and tested by Dynamic DNA for COVID-19, pursuant to OVMC's contract with Dynamic DNA. OVMC incurred the expense of the COVID-19 tests, and OVMC paid Dynamic DNA the total invoiced amount of $589,143.24. OVMC clients, patients, or their patients' employers paid OVMC approximately $1 million for these COVID-19 tests. In DERGES' December 4, 2020, e-mail to Greene County, DERGES wrote, "…the majority of every day: our staff literally spends testing," and "We would just be thrilled to get what help we could on the testing." DERGES concealed from Greene County that these COVID-19 tests had already been paid for by other payors.

75. Based upon DERGES' representations that Lift Up was providing "COVID Testing," the Greene County Commission awarded Lift Up CARES Act funds from the Greene County CARES Act Relief Fund. The Greene County Commission awarded Lift Up $296,574.04, in reimbursement for COVID-19 testing based upon Lift Up's application and the Dynamic DNA invoices DERGES submitted on Lift Up's behalf for April, May, June, July, and August 2020.

76. On December 21, 2020, Greene County Senior Deputy Auditor, A.C., notified DERGES by e-mail that the Greene County Commission had approved Lift Up's CARES Act

award. A.C. attached Lift Up's Award Letter and Lift Up's Subrecipient Award contract to the same e-mail.

77. In the Award Letter, Greene County notified DERGES that Lift Up's application to the "CARES Act Non-Profit and Community Organizations Grant program" had been approved. Specifically, the Award Letter stated that Lift Up was awarded $296,574.04 in "qualified reimbursable expenses" for "Covid Testing." DERGES signed Lift Up's Subrecipient Award contract and returned the same to Greene County by e-mail attachment on December 21, 2020.

78. DERGES e-mailed Greene County Senior Deputy Auditor, A.C. on December 21, 2020, and wrote, "I did want to be sure than when [the check] is sent: that it is sent to the business office at 3259 E. Sunshine, Suite AA, Springfield, MO 65804 and NOT the physical address on Kearney St."

79. On December 23, 2020, Green County sent Lift Up a check by mail through the United States Postal Service in the amount of $296,574.04. The check was payable to "Lift Up Someone Today," through Greene County's UMB Bank account, ending in 1931. DERGES deposited the check into Lift Up's account at Great Southern Bank, account ending 5151, on December 29, 2020. The funds were debited against Greene County's UMB bank account, ending 1931, on December 31, 2020. On February 21, 2021, DERGES transferred $298,024.04 from Lift Up's account at Great Southern Bank, ending 5151, to OVMC's account at Great Southern Bank, account ending 4503.

## COUNTS 1 – 8
### 18 U.S.C. § 1343
(Wire Fraud)

80. The factual allegations of Paragraphs 1 through 5, 7, 10, and 12 through 31 of this Indictment are re-alleged and incorporated as though fully set forth.

**The Scheme to Defraud**

81.     Beginning on an unknown date, but no later than in or about December 2018, and continuing until in or about May 2020, in Greene County, in the Western District of Missouri, and elsewhere, DERGES, with the intent to defraud, devised and intended to devise a scheme to defraud her patients, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

82.     It was a part of the scheme that DERGES presented promotional seminars at which she told prospective patients that she could treat various medical conditions with stem cells by way of false and misleading statements and representations, including that the amniotic fluid allograft that she used in her practice contained stem cells.

83.     It was a part of the scheme that DERGES told patients that she was treating them with stem cells by way of false and misleading statements and representations, including that the amniotic fluid allograft that she administered to the patient as part of the patient's treatment contained stem cells.

84.     In furtherance of the scheme DERGES injected A.L. with 2 ml of amniotic fluid allograft on September 11, 2019, and October 23, 2019. A.L. suffered from hip pain. A.L. met DERGES at a Las Vegas pain management seminar where A.L. discussed her condition with DERGES. After discussing treatment options with DERGES, A.L. decided to try DERGES' "stem cell" injections.

85.     In furtherance of the scheme DERGES injected D.B. with 2 ml of amniotic fluid allograft on December 19, 2019, and February 12, 2020. D.B. suffered from hip pain and found DERGES through OVMC's website. D.B. was seeking stem cell treatment for hip pain. DERGES

told D.B. that DERGES obtained the "stem cells" she used in D.B.'s treatment from the University of Utah.

86.     In furtherance of the scheme DERGES injected J.K. with 2 ml of amniotic fluid allograft on October 9, 2019, and December 10, 2019. J.K. suffered from hip and back pain. J.K. did on-line research into stem cell treatment for J.K.'s pain and found DERGES through OVMC's website. DERGES told J.K. that the amniotic fluid allograft contained "stem cells." DERGES injected J.K. with 2 ml of amniotic fluid allograft on October 9, 2019, and December 10, 2019.

87.     In furtherance of the scheme DERGES administered to A.M. a total of 6 ml of amniotic fluid by IV and nebulizer on November 12 and 20, 2019, and 3 ml of amniotic fluid by IV and nebulizer on June 17, 2020. A.M. suffered from COPD. A.M. heard DERGES discussing stem cell treatments on a radio show, which led A.M. to set up an appointment with DERGES. DERGES told A.M. that the stem cells she would be administering to him were newer than his own stem cells because they came from amniotic fluid that was extracted by the University of Utah.

88.     In furtherance of the scheme DERGES injected T.M. with 1 ml of amniotic fluid allograft on February 19, 2019. T.M. suffered from erectile dysfunction. T.M. found OVMC and DERGES through internet research into platelet rich plasma treatment. DERGES recommended stem cells to T.M. as an alternative treatment to platelet rich plasma treatment he came to her seeking. T.M. followed DERGES' recommendation.

89.     It was further a part of the scheme that DERGES induced her patients, including A.L., D.B., J.K., A.M., and T.M. to pay between $950.00 and $6,500 for amniotic fluid allograft that the patients believed contained stem cells. In total, DERGES' patients paid DERGES approximately $191,815.00 for amniotic fluid that did not contain stem cells.

## The Charges

90.     On or about each of the dates set forth below, in Greene County, in the Western District of Missouri, and elsewhere, the defendant, **PATRICIA ASHTON DERGES**, for the purpose of executing the scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises described above, did knowingly transmit and caused to be transmitted, and attempted to transmit and cause to be transmitted, in interstate commerce, by means of wire communication, writing, signs, signals, pictures, and sounds, that is the electronic wire transmission of funds, as described below for each count, each transmission constituting a separate count:

| COUNT | Date | Description |
|:---:|:---:|:---|
| 1 | September 12, 2019 | $4,650.00 deposited into Derges' Great Southern Bank account ending 4503 from Central Bank of the Ozarks, debited against A.L.'s account ending 5905. |
| 2 | October 24, 2019 | $3,681.56 deposited into Derges' Great Southern Bank account ending 4503 from Central Bank of the Ozarks, $2,700.00 of which was debited against A.L.'s account ending 5905. |
| 3 | December 23, 2019 | $3,224.00 deposited into Derges' Great Southern Bank account ending 4503 from Capital One Visa, $2,900.00 of which debited against D.B.'s account ending 0095. |
| 4 | February 14, 2020 | $7,195.00 deposited into Derges' Great Southern Bank account ending 4503 from Capital One Visa, $1,950.00 of which was debited against D.B.'s account ending 0095. |
| 5 | October 11, 2019 | $6,175.00 deposited into Derges' Great Southern Bank account ending 4503 from CareCredit, $2,900 of which was debited against J.K.'s account ending 3504. |
| 6 | December 13, 2019 | $3,245.00 deposited into Derges' Great Southern Bank account ending 4503 from CareCredit, $1,750.00 of which was debited against J.K.'s account ending 3504. |
| 7 | November 12, 2019 | $6,500.00 deposited into Derges' Great Southern Bank account ending 4503 from Arvest Bank, debited against A.M.'s account ending 6748. |
| 8 | February 21, 2019 | $3,980.00 deposited into Derges' Great Southern Bank account ending 4503 from American Express, of which $1,905.00 was debited against T.M.'s account ending 1009. |

All in violation of Title 18, United States Code, Section 1343.

<u>**COUNT 9-18**</u>
21 U.S.C. § 841(h)(1)
(Distribution by Means of the Internet without a Valid Prescription)

91.     The factual allegations of Paragraphs 1 through 5, 7, 10, 12 through 15, and 32 through 50, of this Indictment are re-alleged and incorporated as though fully set forth.

92.     On or about each of the dates set forth below, in Greene County, in the Western District of Missouri, and elsewhere, the defendant, **PATRICIA ASHTON DERGES**, did knowingly, intentionally, and unlawfully distribute the listed Schedule II controlled substances, through invalid prescriptions by means of the internet, in violation of Title 21, United States Code, Section 841(h)(1).

| Count | Patient | Treating Assistant Physician | Prescription Date & Pharmacy Received Date | Prescription Number | Controlled Substance |
|-------|---------|------------------------------|--------------------------------------------|---------------------|----------------------|
| 9 | P.V. | H.D. | 10/25/2019 | 2263554 | Oxycodone HCL 10 mg x 9 |
| 10 | K.K. | R.P. | 11/18/2019 | 2077228 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 60 |
| 11 | K.K. | R.P. | 12/12/2019 | 2077579 | Amphetamine-dextroamphetamine (Adderall) 10 mg x 30 |
| 12 | K.K. | R.P. | 01/22/2020 | 2078132 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 13 | K.K. | R.P. | 02/20/2020 | 2078520 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 14 | K.K. | R.P. | 03/18/2020 | 2078929 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 15 | K.K. | J.K. | 04/23/2020 | 2079321 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 60 |

Case 6:21-cr-03016-BCW   Document 18   Filed 03/26/21   Page 21 of 26

| 16 | B.H. | H.D. | 02/27/2020 | 2222255 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
|----|------|------|------------|---------|---------------------------------------------------|
| 17 | B.H. | H.D. | 04/02/2020 | 2222565 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |
| 18 | B.H. | J.K. | 05/04/2020 | 2222816 | Amphetamine-dextroamphetamine (Adderall) 5 mg x 30 |

**COUNT 19**
18 U.S.C. § 1001(a)(2)
(False Statement or Representation Made to a Department or Agency of
the United States)

93.     On or about May 5, 2020, in Greene County, in the Western District of Missouri,

the defendant, **PATRICIA ASHTON DERGES** did willfully and knowingly make a materially

false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of

the executive branch of the Government of the United States, by stating to Federal Bureau of

Investigation, Special Agent M.E. and United States Department of Health and Human Services,

Office of Inspector General, Special Agent T.D., that the amniotic fluid allograft that she used in

her practice contained mesenchymal stem cells. The statement and representation was false

because, as **PATRICIA ASHTON DERGES** then and there knew, the amniotic fluid allograft

that she used in her practice did not contain mesenchymal stem cells.

In violation of Title 18, United States Code Section 1001.

**COUNT 20**
18 U.S.C. § 1001(a)(2)
(False Statement or Representation Made to a Department or Agency of
the United States)

94.     On or about May 5, 2020, in Greene County, in the Western District of Missouri,

the defendant, **PATRICIA ASHTON DERGES** did willfully and knowingly make a materially

false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of

the executive branch of the Government of the United States, by stating to Federal Bureau of Investigation, Special Agent M.E. and United States Department of Health and Human Services, Office of Inspector General, Special Agent T.D., that she had not treated a patient for urinary incontinence with amniotic fluid allograft. The statement and representation was false because, as **PATRICIA ASHTON DERGES** then and there knew, she had treated a patient for urinary incontinence with amniotic fluid allograft.

In violation of Title 18, United States Code Section 1001.

## COUNTS 21 – 23
18 U.S.C. § 1343
(Wire Fraud)

95.     The factual allegations of Paragraphs 1, 4 through 11, and 51 through 79 of this Indictment are re-alleged and incorporated as though fully set forth.

### The Scheme to Defraud

96.     Beginning on an unknown date, but no later than in or about September 2020, and continuing until in or about December 2020, in Greene County, in the Western District of Missouri, and elsewhere, DERGES, with the intent to defraud, devised and intended to devise a scheme to defraud Greene County, Missouri, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

97.     It was a part of the scheme that DERGES, on behalf of Lift Up, applied for CARES Act funds to the Greene County CARES Act Relief Fund, and in the application represented that Lift Up was providing "COVID testing."

98.     It was a part of the scheme that DERGES, on behalf of Lift Up, sought reimbursement for Lift Up for "COVID-19 eligible expenses" that Lift Up had not incurred.

99. It was part of the scheme that DERGES, on behalf of Lift Up, represented to Greene County that OVMC's costs for COVID-19 tests were Lift Up's expenses.

100. In furtherance of the scheme, on September 19, 2020, DERGES represented to Greene County, in Lift Up's application to the CARES Act Relief Fund, that Lift Up provided "Covid Testing" and had spent $308,189.00 for "COVID Testing" between March 2020 and September 2020.

101. In furtherance of the scheme, on September 19, 2020, DERGES submitted e-mails of OVMC's Dynamic DNA invoices for COVID-19 testing for April, May, June, July, and August 2020, totaling $296,574.04, to Greene County. DERGES submitted these invoices as costs incurred by, and expenses paid by, Lift Up for COVID-19 testing.

102. In furtherance of the scheme, on December 4, 2020, DERGES submitted OVMC's Dynamic DNA invoices for COVID-19 testing for April, May, June, July, August, September, October, and November 2020, totaling $589,143.24 to Greene County. DERGES submitted these invoices as costs incurred by, and expenses paid by, Lift Up for COVID-19 testing.

103. In furtherance of the scheme, DERGES concealed from Greene County that OVMC paid Dynamic DNA's invoices.

104. In furtherance of the scheme, DERGES concealed from Greene County that OVMC had been paid approximately $1 million by their clients, patients, or their patients' employers, for the COVID-19 tests billed on the Dynamic DNA invoices that DERGES submitted to Greene County as costs incurred by, and expenses paid by, Lift Up.

## The Charges

105. On or about each of the dates set forth below, in Greene County, in the Western District of Missouri, and elsewhere, the defendant, **PATRICIA ASHTON DERGES**, for the

purpose of executing the scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises described above, did knowingly transmit and caused to be transmitted, and attempted to transmit and cause to be transmitted, in interstate commerce, by means of wire communication, writing, signs, signals, pictures, and sounds, as described below for each count, each transmission constituting a separate count:

| COUNT | Date | Description |
|-------|------|-------------|
| 21 | September 19, 2020 | Submitted through the internet, the Lift Up application to the Greene County CARES Act Relief Fund. |
| 22 | December 4, 2020 | E-mail from DERGES to Greene County with Dynamic DNA invoices attached. |
| 23 | December 29, 2020 | $296,574.04 deposited into Lift Up's Great Southern Bank account, ending 5151, debited against Greene County's UMB Bank account, ending 1931. |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATION

106.     The factual allegations of Paragraphs 1 through 3, 51 through 90, and 95 through 105, of the Indictment are re-alleged and incorporated as though fully set forth herein for the purpose of alleging forfeiture to the United States pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 1343, and Title 28, United States Code, Section 2461.

107.     As a result of the offenses alleged in Counts 1 through 8 and 21 through 23 of this Indictment, and pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461, the defendant, **PATRICIA ASHTON DERGES**, shall forfeit to the United States all property, real and personal, constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of the violations incorporated by reference in this Allegation.

## Money Judgment

108.    A money judgment representing proceeds obtained by the defendant in that the sum in aggregate, constitutes or is derived from proceeds traceable to the offenses set forth in Counts 1 through 8 and 21 through 23.

## Substitute Assets

109.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred, sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of forfeitable property.

**A TRUE BILL**

_/s/ Kevin Elliott_
_____
**FOREPERSON OF THE GRAND JURY**

_/s/ Shannon Kempf_
_____
**SHANNON T. KEMPF**
Assistant United States Attorney

DATED:  __3/23/2021_____